1  **MICHAEL G. DAWE, SBN 94987**
   **Of counsel to:**
2  **BORCHARD & CALLAHAN**
   **michaelgdawe@icloud.com**
3  **25909 Pala, Suite 300**
   **Mission Viejo, CA 92691**
4  **Phone No.:    (657) 622-3276**
   **Fax No.:        (949) 457-1666**
5
   Attorneys for CASTALLET, INC., dba
6  THOMPSON BUILDING MATERIALS

7

8                    **UNITED STATES DISTRICT COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

10

11  CASTELLET, INC. dba THOMPSON          Case No.
    BUILDING MATERIALS, a California
12  corporation,                          **COMPLAINT FOR (1)**
                                          **DECLARATORY RELIEF; (2)**
13                      Plaintiff,        **BREACH OF CONTRACT; (3)**
                                          **TORTIOUS BREACH OF**
14         v.                             **CONTRACT; (4) VIOLATIONS OF**
                                          **BUSINESS AND PROFESSIONS**
15  GOLDEN    EAGLE    INSURANCE          **CODE §§ 17200 et seq.**
    CORPORATION, a New Hampshire
16  corporation; PEERLESS INSURANCE
    COMPANY,    a    New    Hampshire
17  corporation; and LIBERTY MUTUAL       **DEMAND FOR JURY TRIAL**
    INSURANCE    COMPANY,    a
18  Massachusetts corporation,

19                      Defendants.

20

21         Plaintiff alleges as follows:

22                              **PARTIES**

23         1.      Plaintiff CASTELLET, INC. dba THOMPSON BUILDING MATERIALS

24  ("Thompson" or "Plaintiff") is a California corporation with its principal place of

25  business in Orange County, California.

26         2.      Defendant GOLDEN EAGLE INSURANCE CORPORATION ("Golden

27  Eagle") is alleged on information and belief to be a New Hampshire corporation with

28  its principal place of business in Boston, Massachusetts.

---

COMPLAINT

3.      Defendant PEERLESS INSURANCE COMPANY ("Peerless") is alleged on information and belief to be a New Hampshire corporation with its principal place of business in Boston, Massachusetts.

4.      Defendant LIBERTY MUTUAL INSURANCE COMPANY ("Liberty Mutual") is alleged on information and belief to be a Massachusetts corporation with its principal place of business in Boston, Massachusetts.

5.      Golden Eagle and Peerless are alleged on information and belief to be members of an integrated and unified group of insurance-related business entities which represents itself to the public, *inter alia*, as "Liberty Mutual Insurance Company" and, or, "Liberty Mutual Group."

6.      Liberty Mutual is alleged on information and belief to be an entity comprising Golden Eagle, Peerless, and numerous other insurance companies under its ownership, control, and operation. Liberty Mutual is legally and equitably the corporate alter ego of Golden Eagle and Peerless. In their capacity as alleged alter egos, each of the other, Liberty Mutual, Peerless and Golden Eagle will be referred to herein collectively as "Liberty" or "Defendants."

7.      Liberty does business generally throughout the State of California and has done, and continues to do, business in Orange County, California.

8.      Liberty provided insurance coverage to Thompson under at least two consecutive General Liability Insurance Policies covering the time frame of June 23, 2016 to July 29, 2011 (the "Policy" or "Policies").

9.      The Policies were issued on the stationery of Golden Eagle, and contained verbiage indicating that they were issued on behalf of Peerless.

## JURISDICTION AND VENUE

10.     This Court has diversity jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332 because: (1) Plaintiff is a corporation incorporated under the laws of the State of California, and Defendants are corporations which are neither incorporated in the State of California nor have their principal place of business in the State of

California; and (2) the amount in controversy exceeds seventy five thousand dollars ($75,000.000) exclusive of interests and costs.

11.    Venue is alleged in this Southern division of the Central District pursuant to 28 U.S.C. § 1391(d) based on the fact that Defendants, and each of them, have contacts in this district, which, if the district was a separate state, would be sufficient to subject each defendant to personal jurisdiction in that hypothetical separate state.

## **GENERAL ALLEGATIONS**

**I.    Lawsuit Against Thompson Triggers Insurance Coverage Claim to Liberty**

12.    On April 22, 2009, Thompson was sued in Torrance, California (the "Prince Action"). A true and accurate copy of the Complaint and the Prince Action is appended hereto as **Exhibit 1.**

13.    The plaintiffs in the Prince Action (the "Princes") hired a general contractor for construction at the property, and the general contractor retained a subcontractor, John Simich Construction, Inc. ("Simich"), to perform shoring, concrete foundation, and masonry work.

14.    Simich's masonry work included the laying of flagstone in the patio and pool area (the "Project"). Simich bought materials for the project from Thompson, among these materials being the aforementioned flagstone (the "Stone").

15.    Thompson timely tendered the defense of the Prince Action to Liberty.

16.    Thompson is informed and believes and based thereon alleges that Liberty failed to properly investigate the claims against Thompson alleged in the Prince Action, and failed to provide a timely response to Thompson's tender of defense.

17.    Liberty responded to Thompson's tender of defense by letter of October 16, 2009. A true and accurate copy of the first denial letter is appended hereto and incorporated herein by reference as **Exhibit 2.**

18.    Liberty issued a second denial letter on December 9, 2010.  A true and accurate copy of the second denial letter is appended hereto and incorporated herein by reference as **Exhibit 3.**

19.    Liberty issued a third denial letter on January 26, 2011. A true and accurate copy of the third denial letter is appended hereto and incorporated herein by reference as **Exhibit 4.**

20.    The second and third denial letters[1] were authored by Liberty's Veronica Johnson ("Johnson").

21.    Thompson is informed and believes and based thereon alleges that at the time of authoring the Denial, Johnson was a Senior Technical Claims Specialist in the Special Liability Claims section of Liberty's Construction Defect Unit.

22.    Thompson is informed and believes and based thereon alleges that in her employment capacity, Johnson had claims handling responsibility with respect to claims by insureds for insurance coverage from various members of Liberty.

23.    Thompson is informed and believes and based thereon alleges that Johnson's handling of this claim conformed with Liberty's customary standards of claims handling practice.

24.    Thompson is informed and believes and based thereon alleges that there was nothing Johnson did in her handling of Thompson's claim for coverage that was in any way inconsistent with Liberty's customary standards of claims handling practices.

II.    **The Material Provisions Of the Policies**

25.    The "Insuring Agreement" of the Policies is set forth in the Denial. (Exhibit 3-2.)

26.    The Policies included a "products-completed operations hazard" exclusion ("Products Hazard Exclusion"), which is cited in Liberty's denials (see Exhibit 3-3) and which is incorporated by reference herein. By definition, the Products Hazard Exclusion excludes from coverage all "property damage" which falls within the scope of the defined "products-completed operations hazard" in the policy.

---

[1] The second and third denial letters, which appear to be identical in content, shall hereinafter be referred to collectively as "the Denial."

27. As such, the Products Hazard Exclusion excludes, *inter alia*: "all…'property damage' occurring away from premises [the insured] own[s] or rent[s] **and [which] aris[e]… out of" the insured's product.** (Emphasis added.)

28. As employed in the Products Hazard Exclusion, the words "and arising out of 'your product'" are ambiguous.

29. As employed in the Products Hazard Exclusion, the words "and arising out of 'your product'" could reasonably be narrowly interpreted to signify only "property damage" that was actually "caused by" the insured's "product."

30. Under such a reasonable but narrow interpretation the exclusion would not apply to "property damage" that "arose out of" some alternative cause other than out of the "product" itself.

31. Alternatively, the Products Hazard Exclusion language "and arising out of 'your product'" could be interpreted more broadly to require merely that the product itself was in some way involved in the chain of events bringing about the alleged "property damage," even if the principal cause of the "property damage" was something other than the "product" itself.

32. If, for instance, the eventually-determined cause of the Princes' alleged "property damage" was not Thompson's "product" itself, but some other source, then the "property damage" would not have "arisen out of" Thompson's product and the "products-completed operations hazard" exclusion would not preclude Liberty's indemnity coverage obligation or its duty to defend.

33. As has been clearly repeatedly and expressly recognized in California law for decades, the "duty to defend" of an insurer under a liability policy such as that applicable here is exceptionally broad—much broader than the scope of the insurers "duty to indemnify" under the same policy.

34. Insurers such as Liberty have the "duty to defend" their insureds against lawsuits such as that brought by the Princes against Thompson where there is even a

"bare potential or possibility" of some covered damage being proved against the insured in the underlying liability lawsuit.

35.    In order for an insurer such as Liberty to deny its duty-to-defend coverage upon a tender of defense such as that made on behalf of Thompson here, the insurer must be able to conclude correctly and certainly that there is not even a "bare potential or possibility" of covered damages being proven against the insured.

36.    Given the ambiguous language of the exclusion relied upon by Liberty in denying coverage to Thompson herein, Liberty must have been able to correctly and certainly establish that, under the narrowest reasonable interpretation of the language of the exclusion, the only "property damage" alleged by the Princes were necessarily caused solely by Thompson's "product," and were not caused by, or did not "arise out of," any cause or source other than Thompson's product.

37.    As of the time of tender of defense, and from a reading of the Princes' complaint, it was evident that there were potential causes of the alleged deterioration of the Stone other than the Stone itself.

38.    One such potential cause was the negligent or improper selection of the Stone by the Princes, or by individuals working for them such as their designer and/or the general contractor and or their subcontractor that installed the Stone at the Prince residence.

39.    In this regard Thompson is informed and believes from its defense of the underlying Prince lawsuit that, at the time the subcontractor purchased the Stone for installation at the Princes' home, the subcontractor was of the opinion that the Stone had a natural tendency for some deterioration and, or, flaking.

40.    Plaintiff is further informed and believes that the subcontractor actually advised the Princes, through their designer, who was present with the subcontractor at the Thompson building materials yard at the time the Stone was selected for purchase, of the potential for the Stone to flake, or sustain some deterioration, once installed.

41.    If, under these circumstances, the Princes, their designer, and, or, their subcontractor, chose to install the Stone at the Princes' residence, then any "property damage" which had any relationship to the known potential of the Stone to flake or sustain some deterioration "arose out of" the decision-making of the Princes and their agents, rather than out of Thompson's "product," as that term is employed in the Product Hazard Exclusion.

42.    Another potential cause of the property damage alleged by the Princes would be that Thompson, through its personnel, acted negligently in connection with the sale of the Stone, failing to warn, or failing to instruct the subcontractor with respect to the potential flaking and/or deterioration of Stone, and/or the manner in which the Stone should be installed, sealed, protected, and or maintained first by the subcontractor, and then by the homeowner.

43.    Another potential cause of the property damage alleged by the Princes would be that the Stone was not properly installed and/or properly sealed by the subcontractor, thus resulting in the alleged flaking and or deterioration of the Stone.

44.    Another potential cause of the property damage alleged by the Princes was that the contractor may have attempted to properly seal the Stone upon installation, but did so negligently, applying chemicals to the Stone in such a manner as to cause it to flake and/or deteriorate rather than preventing or minimizing flaking and/or deterioration.

45.    Another potential cause of the property damage alleged by the Princes was that the Princes themselves, or individuals or entities working on their behalfs, exposed the Stone excessively to chemicals, such as chlorine, salt, or other chemicals, including but not limited to cleaning products, which caused the Stone to flake and/or deteriorate excessively.

46.    With respect to the alleged damage claimed by the Princes to their pool equipment, it was entirely uncertain at the time of the tender of defense to Liberty by

Thompson, again assuming only *arguendo* that there was actual damage to the pool equipment as alleged by the Princes, that the damages "arose out of" the Stone.

47.    It goes without saying that plaintiffs make allegations in complaints all the time, and the mere fact that the allegation is made does not establish its truth.

48.    Damage to pool equipment could arise out of innumerable sources other than the Stone.

49.    All of the foregoing constitute potential causes or sources of property damage alleged by the Princes which, once a defense of the Princes' lawsuit was undertaken, could foreseeably have resulted in establishing that no damages "arose out of" the Stone sold by Thompson to the subcontractor Simich.

50.    Another possibility that Liberty was obliged to consider upon receipt of Thompson's tender of defense was the possibility that the allegations of the Princes' complaint were false, fraudulent, or otherwise meritless, and that the Princes did not actually sustain the property damage they alleged.

51.    In denying any duty to defend, Liberty employed the more restrictive interpretation of the words "and arising out of 'your product.'"

52.    In denying the duty to defend, Liberty assumed that all of the "property damage" which might be proven by the underlying plaintiffs necessarily fell exclusively within the scope of the broadly interpreted "products-completed operations hazard" exclusion in the policy.

53.    Under California law, however, the words "and arising out of 'your product,'" as employed in the exclusion, were required to be interpreted by Liberty "narrowly against the insurer," with the "closest possible scrutiny," so as to "afford the greatest possible protection" to Liberty's insured.

54.    Interpreted narrowly as instructed by California law, the express terms of the "products-completed operations hazard" exclusion applies only to exclude indemnity coverage, and not defense coverage, if and when it is established that the claimed "property damage" was actually caused by Thompson's product.

### III.  Liberty's Failure to Thoroughly Investigate

55.    Upon receipt of Thompson's tender of defense, Liberty had a duty to promptly and thoroughly investigate the claims being made by the Princes against Thompson.

56.    As a matter of law, Liberty could not deny a duty to defend Thompson without first having undertaken a sufficient investigation of the facts to establish with certainty that there was literally no potential or possibility that the allegations of the Prince complaint could prove damages falling within the scope of an excluded "property damage" within the policy period

57.    In order to have reached the conclusion that the only "property damage" alleged by the Princes necessarily fell solely and exclusively within the scope of the Products Hazard Exclusion, Liberty necessarily had to have conducted an investigation, the results of which compelled the conclusion that Thompson's product, and nothing other than Thompson's product, caused all of the "property damage" alleged by the Princes.

58.    Thompson is informed and believes that prior to issuing its Denial of both indemnity coverage and the duty to defend, Liberty did not conduct any investigation other than reviewing the allegation of the underlying complaint, and the language of the insurance policy.

59.    Thompson is informed and believes that Liberty did not interview any representative of Thompson, any representative of the Princes, or any representative of either the general contractor or the subcontractor responsible for the installation of the Stone.

60.    Thompson is further informed and believes that prior to issuing its Denial, Liberty did not conduct any site inspection of the alleged "property damage" at the Project or make any attempt to determine the source of the cause of that alleged "property damage."

COMPLAINT

61.    In this regard Thompson is further informed and believes that prior to issuing its Denial, Liberty made no determination of whether or not the "property damage" alleged in the Prince Action may have arisen out of defective design by architects, the defective installation by the subcontractor, negligence by the subcontractor, the designer, or the Princes themselves in choosing the Stone, negligence on the part of the subcontractor or any third person in the process of sealing, or in choosing to fail to seal the Stone once installed, or improper maintenance or abuse of the Stone once it had been installed.

62.    Thompson is informed and believes that the records of Liberty will reflect that, at the time it denied both the duty to indemnify and duty to defend to Thompson following Thompson's tender of the defense of the underlying Prince Action, Liberty did not have evidence in its statutorily mandated claims file from which it could have correctly concluded with certainty that all of the "property damage" alleged by the Princes necessarily fell within the Products Hazard Exclusion, assuming that exclusion was interpreted narrowly and with the "closest possible scrutiny" as mandated by California law.

63.    Thompson incurred substantial expenses in defending the Prince Action.

### FIRST CAUSE OF ACTION

### (Declaratory Relief – Against All Defendants)

64.    Thompson incorporates by reference each of the allegations set forth herein above as if set forth in full in this paragraph.

65.    There are ongoing genuine and material disputes between Thompson and Defendants which require adjudication by this Court.

66.    Thompson contends that Defendants breached the duty to defend Thompson against the claims made against them by the parties in the Prince Action.

67.    Defendants deny that Thompson was entitled to either a defense or any other coverage benefits under the Policies arising from the Prince Action.

68.     Thompson has sustained substantial damages in the form of costs and expenses in the defense of the underlying Prince Action as a direct and proximate result of Defendants' breach of its duty to defend Thompson therein.

69.     Thompson seeks a declaration from this Court establishing that, as alleged hereinabove, and as to be proven at trial in greater detail, Defendants and each of them owed Thompson the alleged duty to defend the Prince Action as of Thompson's initial tender of defense.

## SECOND CAUSE OF ACTION

### (Breach of Written Insurance Contracts – Against All Defendants)

70.     Thompson incorporates by reference each of the allegations set forth herein above as if set forth in full in this paragraph.

71.     By denying both the duties to defend and indemnify Thompson against the allegations and claimed damages of the Prince Action, Defendants and each of them have substantially breached their written contract(s) of insurance with Thompson.

72.     Thompson has sustained actual consequential damages as a proximate result of the breach of contract by the Defendants, and each of them.

87.     Thompson's damages include but are not limited to the amount of costs and fees Thompson reasonably incurred in defending the underlying Prince Action.

## THIRD CAUSE OF ACTION

### (Tortious Breach of Contract – Against All Defendants)

73.     Thompson incorporates by reference each of the allegations set forth herein above as if set forth in full in this paragraph.

74.     In conducting themselves as so alleged, Defendants have acted tortiously in a reprehensible manner.

75.     Thompson alleges on information and belief that Defendants have so conducted themselves intentionally, with the knowledge that their conduct is wrongful and inexcusable, and with the actual awareness that their wrongful conduct is inflicting substantial harm upon Thompson.

11
COMPLAINT

76.     Thompson further alleges, on information and belief, that the sole motivation behind Defendants' alleged misconduct was for their own improvidently perceived and immoral financial benefit.

77.     Thompson finally alleges that the misconduct of the Defendants and each of them has been undertaken fraudulently, maliciously, and oppressively in that the Defendants have knowingly misrepresented the meaning of their policy provisions and the scope of their Policy and the scope of their insurance coverage responsibilities with the conscious awareness that doing so has cause and is continuing to cause Thompson substantial actual damages, which the Defendants are aware could and would have been avoided if the Defendants had honored the obligations they are aware they actually owe to Thompson.

## FOURTH CAUSE OF ACTION

**(Injunctive Relief Under to Business and Professions Code § 17200 – Against All Defendants)**

93.     Thompson incorporates by reference the allegations set forth hereinabove.

94.     Thompson is informed and believes that Defendants' denial of the duty to defend in this matter is part of a consistent, frequent and regular pattern and practice knowingly engaged in by Defendants through which they interpret exclusionary clauses in a liberal and overbroad manner so as to putatively justify the denial of the duty to defend notwithstanding their actual awareness that, in so doing, they are wrongfully denying insureds benefits to which they are entitled under their policies.

95.     The foregoing pattern and practice is an unfair and, or, fraudulent business act or practice, and unfair competition, violating, *inter alia*, the Unfair Competition Law ("UCL") of California, Business & Professions Code § 17200 et seq.

96.     Thompson is informed and believes that the unfair and fraudulent business practice knowingly harms the insureds of Defendants by denying them the benefits of the policies for which they have paid premiums, but also allows Defendants an undue,

unfair and inappropriate advantage in the market of insurers in that the natural and undoubtedly intentional consequence of Defendants' misconduct is to enhance their financial bottom line by unjustly allowing them to avoid claims expenses that should otherwise incur.

97.    Thompson is informed and believes that this practice of Defendants has continued for many years, and will continue for many more, unless it is enjoined.

98.    Thompson further alleges that that there is no legal remedy sufficient to rectify Defendants' unfair business practices and unfair competition in this regard and equity therefore compels the issuance of prohibitory and/or mandatory injunctive relief consistent with the provisions of the UCL and in the interests of equity and justice.

**WHEREFORE,** Thompson prays judgment as follows:

**ON THE FIRST CAUSE OF ACTION**

1.    For a declaration that Defendants and each of them owed Thompson a duty to defend the allegations of the Prince Action, which arose "immediately" upon the receipt by Defendants of Thompson's written tender of defense;

2.    For other such relief as this Court deems just and equitable.

**ON THE SECOND CAUSE OF ACTION**

1.    For actual damages in accordance with proof at trial;

2..    For other such relief as this Court deems just and equitable.

**ON THE THIRD CAUSE OF ACTION**

1.    For actual damages in accordance with proof at trial;

2.    For costs of suit reasonably incurred herein and attorneys' fees under the doctrine reflected in *Brandt v. Superior Court* (1985) 37 Cal.3d 813;

3.    For an award of punitive damages;

4.    For other such relief as this Court deems just and equitable.

/ / /

/ / /

/ / /

**<u>ON THE FOURTH CAUSE OF ACTION</u>**

     1.    For injunctive prohibitive relief of a prohibitive and/or mandatory nature in accordance with proof;

     2.    For such other relief as the court deems just and equitable.

DATED:  April 6, 2018            BORCHARD & CALLAHAN

By:     */s/ Michael G. Dawe*
          MICHAEL G. DAWE
          Attorneys for CASTALLET, INC., dba
          THOMPSON BUILDING MATERIALS

## **DEMAND FOR JURY TRIAL**

In accordance with Federal Rules of Civil Procedure 38 and 39, Plaintiff CASTELLET, INC. dba THOMPSON BUILDING MATERIALS, a California corporation, hereby assert its right under the Seventh Amendment of the United States Constitution and demands a trial by jury on all issues embodied in Plaintiff's Complaint.

DATED:  April 6, 2018                    BORCHARD & CALLAHAN

By:      */s/ Michael G. Dawe*
         MICHAEL G. DAWE
         Attorneys for CASTALLET, INC., dba
         THOMPSON BUILDING MATERIALS